v. Trader Joe's East, Inc. May it please the Court, Josh Goodbaum for the Plaintiff at Pal Land, Tracy Flanagan. Ms. Flanagan sued her former employer, Defendant Trader Joe's, because her termination she believed was motivated at least in part by her sex, and the evidence that was developed in discovery bore out that theory sufficiently to the point where a jury could believe it. This appeal involves a de novo review of a summary judgment decision in which the district court incorrectly found that Ms. Flanagan failed to meet her burden at both step one and step three of the McDonnell-Douglas inquiry. Trader Joe's seems to concede the error at step one of the inquiry. Ms. Flanagan concedes the sufficiency of Trader Joe's nondiscriminatory explanation at step two, and the question for this Court then is whether at step three Ms. Flanagan has brought forward sufficient evidence that the explanation given by Trader Joe's was not the real or complete reason. In the language that this Court used in Judge Nardini's panel decision in Bart v. Golub, we believe she has for two independently sufficient reasons. First, she has offered evidence from which a reasonable juror could find pretext in that Trader Joe's previously and repeatedly authorized the precise action for which it later purportedly terminated her. And second, she has brought forward evidence from which a reasonable juror could find that Trader Joe's treated differently a similarly situated male co-worker. I want to call these the pretext argument and the comparator argument and to address each of them for the Court. With respect to the second part, is there any evidence that gender was a factor other than the one comparator, Perry Zedderston? If what you're saying, Your Honor, is are there any statements that the action was gender motivated? I wasn't saying anything. I was asking if there is anything else in the record that suggests from which a jury could find gender discrimination other than the comparison with Mr. Zedderston. That, Your Honor, and that the jury could find that Trader Joe's explanation was false. So it is those two reasons together. We think each of them is independently sufficient for this Court to vacate and require a jury trial. So false that the only explanation would be sex discrimination, right? I don't think that's true, Your Honor, and I don't think that's what the law suggests. The law says the pretext has to be to cover up gender discrimination. That's right. So if the jury found that the defendant was lying, it doesn't then have to say necessarily they're lying because the only reason for their action was the protected characteristic. They could find that lying in and of itself is a cover-up for something. Now, I suppose the jury could say they're covering up for some very embarrassing but not illegal reason. But in general, the default of the courts has been to say, including this Court, has been to say that if a jury could find the defendant is lying in its explanation, it's dissembling in its explanation, that that is a cover-up or a jury could find it's a cover-up for something illegal. Just getting back to the facts here, I mean, it seems to me that your analysis for both the pretext and the similarly situated coworker is it ignores the timing of things. In other words, your client left after there had been sort of basically an emergency declared by the World Health Organization that there's a pandemic and after Meyer issued basically an advisory that people are not supposed to be traveling. The similarly situated person traveled before both of those events? Would you agree? I would agree with that, yes, Your Honor. And so, I mean, doesn't that make them not similarly situated and doesn't that undermine a pretext argument because she got the permissions granted before these events took place, right? No, it doesn't for three reasons, Your Honor. First, the evidence would allow a jury to conclude that the state of panic in Trader Joe's was the same during all of the first three weeks of March, and she received an authorization that is undisputed on March 4th, which is during the first three weeks of March. Second, if you look at the context of Mr. Meyer's statement during this meeting that occurs on March 13th, that's at pages 95 and 96 of the joint appendix, you will see that what he says is, don't travel together. If you're sick, stay home. Minimize travel where you can. This is not cancel travel. It's not cancel PTO. It is directed toward the operations of the business, and she could reasonably have interpreted to mean, and a jury could reasonably interpret it to mean, that it was about business travel. Indeed, the very next note after the note about Mr. Meyer's statement is, midweek transfers from other states should be approved, right? How do you get a midweek transfer from another state? They've got to come from another state, right? So there is clearly business travel that is approved. What it shows is not that she explicitly violated a directive not to travel. It's that it shows bad situational leadership and bad judgment to have decided to travel in the first week of the pandemic. If that's true, then Mr. Zettersten also demonstrated bad judgment, but it's important to remember that on March 15th. But it might be different if she traveled the first week of the pandemic after they had been warned about travel. The question is not that she violated a directive, it's just that the circumstances had changed between the first week of March and the third week of March, right? This court has said repeatedly that ordinarily, whether a comparator is similarly situated in all material respects is a question for the jury. Here, I would say that this is a distinction that doesn't make a difference because on March 15th, two days after the March 13th meeting, Ms. Flanagan writes to her supervisor, Mr. Myers, says, I'm going away, and he replies with three words, okay, good luck, exclamation point. Now, of course, a jury could say that was a sarcastic quip, as Trader Joe's says, but they also easily could find that that was exactly the sort of authorization for personal travel unrelated to work that would undermine the explanation. Could a reasonable jury find that the comparator and the plaintiff were in similar circumstances given the way the world changed in that week? I think they could because the jury will be focused on what was the state of Trader Joe's stores, not what was the state of the world generally, and I urge the court not to rely on periodicals, opinion periodicals provided by Trader Joe's. That goes outside the record. The record here would allow a jury to conclude that during the first three weeks of March, the stores were facing the same issues and had the same problems. The other guy didn't have a disciplinary record, and she did. Is that a significant difference? I don't think it's a material difference here for four reasons, Your Honor. First, it is not core to Trader Joe's explanation, so if you look at their brief at pages 28 to 30, they talk about bad judgment in this situation, not the prior discipline. Second— But the prior discipline did talk about her situational leadership. That's a recurring criticism that predates her taking the trip, right? I don't think that's true, Your Honor, only insofar as everything in doing a job at that level involves some discretion and judgment. But her 2020 annual performance review refers—expresses it to her situational leadership being the root cause of her mistakes, including her failure to uncover a $75,000 embezzlement. But her boss subsequently tells her that that issue is behind her. It's not as if she had a last chance agreement, and it's also important to remember that there were no consequences for Mr. Zederstin. This isn't a situation where one of them was on a last chance agreement or whether one of them had a written warning. And because they engaged in substantially similar— We're not deciding whether Trader Joe's was fair or unfair. We're deciding whether it was a pretextual explanation. So even if they said, okay, I don't have any further issues with this, if the same issue crops up later, it doesn't seem like it's a pretext for them to say, well, now we're worried about it, even more than we would be if this were the first time, because you have a history of it, right? Of course, we're not questioning the business judgment. What we're questioning is the veracity of the explanation. And we are requesting that this be the case.     requires that Trader Joe's treat similarly situated male and female employees the same when they are subject to the same standards. But nobody had questioned the other guy's situational leadership, as far as we know. Had they? That's not revealed by the record, Your Honor. But that was passed in the past, and her supervisor had said, listen, this is not an issue. Don't look over your shoulder. You don't need to file reports with us. It's in the past. Look forward. Well, it's in the past, but it's in her file. You're suggesting that they told her this will never be considered again, never be used against you? No. That's not what I'm saying. What I'm saying is, it was in the past. This is a separate, a factually distinct and importantly distinct violation that they're alleging. And I'm saying— But it also involved a lapse in situational leadership or judgment. Everything— That is the proffered explanation of Trader Joe's, right? Proffered explanation of Trader Joe's is, you went on a vacation on March 16th, and you shouldn't have, even though the previous night we said, okay, good luck, go on this vacation. Well, are you saying that the previous night they said, okay, good luck? I mean, the person wrote, okay, good luck, and then the next morning showed it to a supervisor and said, can you believe that she's doing this, right? The record would allow that inference, yes. But the record would also allow the inference that he permitted her to go through an instruction that said, okay, good luck. And she was entitled to believe that. The record would allow a jury to find that they authorized the conduct. And then they fired her for exactly the conduct they just authorized. But if at the same time—so even if it's an authorization, which I'm not sure it is, but even if it's an authorization, if that person immediately said that this is outrageous, like that she's doing this, how does it show that it's a pretext? I mean, maybe the okay, good luck was a bad response to her. But the question that you're facing is whether their explanation that that's the reason that they terminated her was pretextual, right? So why does the email that says okay, good luck show that when they're deliberating amongst themselves and talking about how outrageous it is that she went on this trip, that that is pretextual? You could think either that the supervisor, Mr. Myers, changed his mind overnight or that he set her up for failure. He said, okay, good luck. I'm so glad she's going because the next morning I'm going to march into my boss, present this horrible conduct that she engaged in, even though I know Mr. Zetterston just the previous week did it. But I don't want Ms. Flanagan here. And so that's why we're going to get her out. And so Myers is the one with the discriminatory intent, you're saying? Ultimately, that is not – the issue of whether it's Mr. Myers or Mr. Bazelon has not been played out in the briefing. But it – I don't think that's a question for the court. So we're talking about the inferences that a jury could make, and you're saying the inference would be that Myers was setting her up. And so it's – even if the other officials really did – so if Myers was setting her up, it means that the actual decision makers were doing it because of the vacation. And you're saying that Myers might have been setting her up, and that intent would be – it's like a cat's paw theory or something. Is that what you're saying? Under that theory, it would be cat's paw, yes, Your Honor. If Mr. Myers had influenced the decision and he did so with a discriminatory intent, then that intent would be transferred to – But you're saying under that theory as if there's multiple theories. But the question is we're trying to decide whether the jury has a viable theory. And so far that's the only one that you've identified. No, there's two theories. There's a pretext theory and there's a comparator theory. And so under the pretext theory you're describing, how could the jury believe it was pretext? You said how could they believe it was pretext when Mr. Myers authorized her just the night before and then immediately walked into the supervisor's office? Even assuming it was authorized, why couldn't they change their mind and conclude that this was just a terrible exercise of judgment to leave at that time under those circumstances? They could change their mind, but a jury is not required to believe they changed their mind. And under that circumstance, it's up to a jury ultimately to decide both whether Trader Joe's explanation is the only available explanation and whether Mr. Zedersohn was similarly situated. The Trader Joe's officials deliberating about it and saying it was bad judgment and so on and they don't mention her sex or anything like that, but you're saying it's so implausible that that was the real explanation even among all of these multiple officials, that it must have been unstated among them that they were discriminating against her on the basis of sex? Well, in fairness, Judge Manasci, we don't have verbatim records of the deliberation between Trader Joe's and the jury is not required to believe the explanation Trader Joe's gives about the conversation that it had about how to make this decision. The fact that Ms. Flanagan can't come forward with evidence that in making the decision either Mr. Myers or Mr. Bazelon made reference to her sex is not a dispositive lack of evidence at this stage of the case. All right. Well, you've got three minutes for rebuttal. We'll now hear from Mr. Bazelon. Thank you, Judge Holden. Thank you. Good morning, Your Honor. It's Jeffrey Babin for Trader Joe's. Tracy Flanagan was not terminated because she's a woman, and she was not terminated because somehow she received permission to travel and then the next day they somehow set her up to fire her. In fact, this idea of a setup is not even something that's been argued before. She was terminated because for the second time she failed to perceive the situation that she was faced with. Contrary to the fact that she is a high-level regional vice president overseeing 24 stores in Connecticut and New York State, they pay her $300,000 a year with bonuses to know better, to have that kind of judgment. It would be different if you had a low-level employee, like in the many cases they cite, where somebody's given permission and then the next day they say, well, you didn't have that permission. It's the fact that she couldn't understand that after... Before we delve into this further, do you agree with Mr. Goodbaum that you have agreed that she has a prima facie case and they have agreed that you have a legitimate non-discriminatory reason that the whole question is at step three? We've decided not to pursue on appeal a challenge to the prima facie case. There are differences in terms of what could rise... give rise to an inference of discrimination and whether simply the fact that there was a male who... a man who took the position. So we're not pressing that issue but the same factual context comes into the pretext. They've admitted that we had a legitimate non-discriminatory reason. It's clear that they have a burden of proof that there's no inference of discrimination in that context. And the court's even said... You mean that we're talking about step three? We're talking about step three here today and Reeve says... So why isn't the argument... Why isn't the argument that, look, they just... They approved it, they said it was fine, they said, OK, good luck, and then they turned around and the very next day, I think, maybe it's two days later but very shortly afterwards, said this was really bad judgment, we're firing you. Why couldn't you infer that they were lying about it or that they had set her up? Well, Your Honour, a couple of things. First, Tracy Flanagan, on a Sunday night email herself, showed a lack of awareness by having waited, saying she hadn't even thought of talking to her new supervisor who was substituting for the supervisor. But the supervisor didn't respond by saying, it really shows a lack of awareness that you're emailing me at the last minute. He says, OK, good luck, and then he turns around and fires her for the thing that he just said was OK. He never said, Your Honour... Or the company does, at least. Yes, he certainly never said he was OK and it's been pointed out the very next morning, he takes the email exchange, the very email exchange that says, OK, good luck, and is deliberated through the highest ranks. The female general counsel, the female vice president of human resources, the president of stores who makes this decision, she admits in the Sunday night email, first of all, she says, I'm leaving, I got my permission. She concedes long before there was a virus. You probably didn't even know about it, OK? But I am packing my car and I am leaving. And she says in her deposition on page 65 of the joint appendix that she only emailed him, quote, out of courtesy, close quote. She was already packing. She had no expectation that he was even going to respond on a Sunday night. And the very next business day, the first business day... She wasn't asking for permission in that email. There's no reasonable inference. I realize I did not let you know. That's correct, Your Honour. But I think the bigger picture is that somebody who has already shown some concern, that they've supported her career. That's why they only gave her a warning, even though other regional vice presidents with judgment issues who were male had been demoted and they've dropped all of those comparatives, which was the focus of their complaint and a lot of their summary judgment. Well, up until that time...  And it's because she didn't... They gave her another chance. They wanted her to succeed. That's the only evidence that's before this court. And what we have is that the fact that she even asked, even if they said, OK, you're a high-level position. If you want to go off, go off, but you're not coming back. That would be perfectly legitimate. And that shows nothing about sex discrimination, Your Honour. The jury is not going to decide... They didn't say you're an adult, so go off, but you're not coming back. They said, OK, go ahead. That's right. You make your own decisions. And then they fired her after the fact. Mr. Myers testified that she's a regional vice president. She'd been there for a long time. She has a high degree of... And he's not going to... It's not like a military sending orders. You go off and you face... And then she faced the consequences. The comparator. Yes, Your Honour. Is it that different? Is it so different that a jury could not find gender discrimination here? Yeah. Your Honour, it's quite different. And first, let me emphasize again that they had dropped all their other comparators that they had emphasized because she had actually fared better than her male peers. And left with only Mr. Perry Zetterstein, just one person. It's a weak case, and Reeves says if you have a weak case, you can still get summary judgment. And even in a discrimination case, especially if there's a weak prima facie case, which they concede because they say there's a prima facie case only because there was a male, Reeves says you can get summary judgment with a weak prima facie case. But Zetterstein wasn't warned by his peers. No one thought... There's no evidence that Trader Joe's thought he had done anything wrong. So this is different than the Rodwan case, which is the Yukon women's soccer match, where the other male athletes clearly had done something wrong. They just didn't get punished. There's no evidence that Trader Joe's thought that Perry Zetterstein had done anything wrong. Well, that begs the question, right? The evidence that she did something wrong is because they fired her, but they didn't fire him, right? So, like, the idea that they do the same thing, but they think in her case it's wrong, and in his case it's not wrong, that just is the question to be decided, right? Well, I think there has to be some evidence that somehow the higher executives had a perception that Mr. Zetterstein had done something that could potentially have been punished. There's no evidence of that. Well, you could make an inference of that, right? Because he also went on his trip and almost immediately started making plans to return because the stores were falling apart after he left. That's just pretty poor situational leadership, doesn't it? Yeah, but it was after he left. And so another regional vice president, Ilana Eba, she was the one who covered for Mr. Zetterstein, and also agreed to cover for Ms. Flanagan, because that was before the virus. She was the one who told Zetterstein to come back, and he came back. He was a domestic trip. He didn't have to cross any borders, and it was before any declaration of emergencies or the all-hands-on-deck meeting. Well, isn't that really the key variable, that this predates the announcement about we're going to cut back on travel, and by the way, we're now in the middle of a worldwide pandemic. Yes, and it was an existential crisis for Trader Joe's, which one week earlier, there was no evidence of that. Certainly there were problems, but there's no evidence of an existential crisis. There's no evidence of that? I mean, come on. Everybody knew that there was this disease and there was panic buying in all of the stores. He had to cut his trip short and come back immediately. And no one after him? There's no evidence that anything was wrong in the first week of March, but it all was terrible the third week of March. Well, certainly, Your Honor, there was tremendous changes happening in the stores, which was discussed in the March 13th meeting. And you have to be available 24 hours a day after that March 13th meeting. That's why they didn't want people to be on the road like regional vice presidents normally are. Well, they didn't say you have to be available 24 hours a day and you can't travel. They said try to minimize travel. Yes, to only have to travel to a store if you have to travel, for example. When did Zetterman come back? So the evidence from Ms. Elba on pages 464 to 465 is that she believed he came back within a couple days. And that's before the announcement, before the telephone conversation? Correct, correct. And she was the one who then, having had that experience the weekend after that March 13th meeting, told her fellow peer, Tracy Flanagan, you implored her not to go. And so there was no ‑‑ Zetterston, when he left, there was no evidence that he was causing stress. There was no evidence that he wrote a flippant e-mail. There was no evidence, you know, on page JA98 that he wrote his team and showed lack of empathy by saying please stay healthy and try to have some fun with your team. These are, you know, on page 142 of the joint appendix, John Basilow showed that they were looking into the question of what she told the team members, which is why they fired her when they did. If you're quoting all these details from the different e-mails, doesn't that suggest that this is really a fact question? You're saying, well, they really are different because she wrote a flippant e-mail and he didn't, even though he went on a trip and had to come back just like she went on a trip and had to come back. I mean, why isn't that a fact question that a jury should decide? Well, first of all, Your Honor, it has to be a material comparator. It's this one person that there's not a time when she left and people were starting to fear for their lives. There's no evidence that people were fearing for their lives when he left just even a week earlier. And if you look at Weinstock v. Columbia University, Fisher v. Vassar College, the Reeves case, they all say that it has to be pretext for purposes of sex discrimination. It's not enough to disbelieve the defendant. There has to be affirmative evidence. There's not a shred of evidence that Trader Joe's treated her or any other woman differently. No conduct, no behavior. So this came up in Mr. Goodbaum's argument. So if it's a plausible inference that Trader Joe's was lying about the reason, but there's nothing to suggest that it was for a sex-based reason, would that mean that it should go to the jury or still should not? It should not go to the jury. I think Weinstock, Fisher, Reeves all say that. And Reeves says you look at the entire case, not just evidence that they proffer, but evidence that we prefer. So all the evidence I've talked about goes to the question of what a reasonable juror could find. And Weinstock says it's not enough to show some evidence. It has to be sufficient for a reasonable juror and that it has to be enough to believe a claim of discrimination. They dropped all their comparators. They're left with Mr. Zettersten, a weak prima facie case. There is no reasonable jury could find on this that Trader Joe's somehow decided to terminate Ms. Flanagan, who they had supported all these years, not one. You still couldn't infer the sex discrimination, but why not? So if it's your burden to come forward with a legitimate non-discriminatory reason, and a district court or we, somebody, thinks that it's plausible that that reason was a misrepresentation, why shouldn't the inference be that it's a misrepresentation for the purpose of covering up sex discrimination? Because there is abundant evidence and consistent evidence that every person who is at the high level of Trader Joe's immediately had the same reaction. There's no flip-flopping. But you're saying it was not a misrepresentation. I've been asking before about it. There's no evidence of that. A jury could decide that it was not correct. Would that be sufficient or not sufficient for them to meet their burden? I think it would still have to show that there was some reason to believe that it was because of her gender. That would be my answer, Your Honor. And let me just briefly, because I know my time is up, but I just want to make sure that the court understands that Mr. Myers, pages 174 to 5 and 182 and 183, says she abandoned her job. Nothing had changed. Everything had changed. Everything had changed since her prior approval. Mr. Bazelon on page 142, 143 says it's because of indifference to her job, and Lori Mead, the vice president of human resources, said the situation had changed since she scheduled the trip. The situational judgment, just like with the embezzlement, she had not shown improvement. They have absolute reason to – Do you think it would be rational for a jury to say, all right, well, they said everything had changed, but in fact the record shows that there was panic buying from the beginning of March, and so the situation hadn't really changed because if we're thinking about not what the WHO has announced but whether somebody is needed to be present at the stores, there really wasn't a different situation because the panics at the stores had started before March 11th. Your Honor, the – Would it be rational for a jury to make that inference? I don't believe so, Your Honor. I think that when – there's no evidence that anyone thought that people couldn't take a vacation if they were properly – had found somebody to cover for them prior to that March 13th meeting, and that's why there was concerns about Ms. Flanagan leaving when she did, and there were no concerns about Mr. Zetterston leaving, but the concerns came after he left and he had just gone to the West Coast and came back to his East Coast post, and they have absolutely every right to make their own judgment as to what type of regional vice president they want, supervising dozens of – you know, a couple dozen stores, and for that reason, Your Honor, again, there's no evidence of gender discrimination, which is the only reason why a case can go forward, and we ask that this Court affirm the summary judgment. If there are no further questions, thank you. All right. Thank you. We'll hear from Mr. Goodmountain for three minutes every vote. Thank you, Judge Sullivan. I want to dig into the record, please, if we can, because I think this is the question of what the jury could make of it, and Trader Joe's continues its pattern of construing the record in its favor rather than in favor of the plaintiff here, and she's entitled to the benefit of all inferences. So on March 13th, when Mr. Myers held that meeting, there is evidence in the record that he already knew about her trip, that he knew about the prior approval, which happened on March 4th. Importantly, there is also evidence in the record that in the first three weeks of March, the state of the Trader Joe's stores was roughly the same. In the beginning of March, customers started, quote, storming the stores. That's at Joint Appendix 508 to 509. That in the first two weeks of March, before she went on her trip, stores were overrun. That's Joint Appendix 143. And that the same issues occurred in the Trader Joe's stores in the second week of March, when Mr. Zettleston traveled, and the third week of March, when Ms. Flanagan traveled. That's JA 158 and 59. As to travel bans, when Ms. Flanagan left, there were no travel bans in place. There were new issues. It wasn't just panic buying, right? All of the employees were afraid to come to work because there was an announcement that stores were shutting down. I mean, there were new issues after the announcement of the pandemic. That's not what the record says, Your Honor. And I caution the Court to bring its own experience of— not to bring its own experience of the pandemic to bear on this case. Well, there are facts that are undisputed and undisputable, right? March 11th, the WHO declares COVID a pandemic. Not before. Yes. March 11th. March 13th, the United States basically declares the pandemic to be a crisis, and they institute a travel ban. No, Your Honor. There are no travel bans in place when Ms. Flanagan leaves. And the travel ban— From 26 European countries, there's a travel ban. Between the United States and Mexico, the travel ban isn't instituted. Not between the United States and Mexico, but things are heating up. By March 13th, there are travel bans in place, right? You disagree with that? There are bans for people from Europe to come to the United States. I don't remember the details of it. I think there was a China ban before that because the disease originated in China. But things were deteriorating so that travel bans were being put into place. And there certainly was a risk that one would be put into place from Mexico while she was away. There was a risk, too, when Mr. Zetterstein went on March 9th, and indeed the travel ban from the U.S. to Mexico did not occur until March 24th, well after she returned. That's Special Appendix 15 to 16. So just focusing on the record, like you said you wanted to do, and Flanagan herself testifies that when she went to Mexico, she started getting emails about store shutdowns on the West Coast and employees who wanted hazard pay, right? Yes. And EBBA testifies it was getting worse and worse as time went on. In March, it became worse and kept going and going as hysteria grew. COVID cases appeared in stores. People got sick. A lot of confusion with information from the CDC and everywhere else that they were getting information. So it progressively got worse every single week. And then she talks about how the employees were breaking down and were worried about coming to work and so on. So isn't that a new set of problems that arose in the second half of March? It's not just the panic buying. I don't think so, Your Honor. Ms. EBBA testifies. I mean, there's contradictory testimony, of course. We concede that the jury is not required to enter a verdict for Ms. Flanagan. But Ms. EBBA also testifies that there were the same issues in the stores in the second and third week of March, and there's evidence that when Ms. Flanagan left on her trip on March 16th, no Trader Joe's employee had been sick in a store. Nobody had been sick in a store. And the fact that she realized as soon as she left, okay, I made a mistake, I need to go back, is identical to Mr. Zedderston, who did exactly the same thing. So the question really then is either whether the travel ban from Europe is a material difference, and I think a jury could say, no, it's not material because he's going to Mexico, or the March 13th meeting is a material difference. But, of course, after the March 13th meeting, Mr. Myers says on the 15th, okay, good luck. And the focus of the March 13th meeting is what's happening in the stores, that is, limit your travel, don't travel together. If you're sick, don't come into work. But if not, cancel PTO. We need all hands on deck. And, of course, she can't be in all the stores. She's got 24 stores, as I said. Where do you think she's working from? Well, she's working from just one location. She's not in the stores moving goods, right? You're talking about whether their policies are reasonable and whether it would have made a difference. But, like, that's a different question from whether the stated reasons are pretextual. No, I think the question is whether it's a change in circumstances sufficient to render Mr. Zederson not a comparator for all material purposes. And here I would say that the differences that Trader Joe's has identified, which we agree are distinctions, are not distinctions that make a difference here because they are not material ones. Okay. Well, thank you both. We will reserve the decision. Thank you. Thank you, Your Honor. Thank you.